(88 South. 458)

No. 23209.

**TOLCHINSKY v. Succession of LIRETTE.**

(On Motion to Dismiss, Nov. 4, 1918. Rehearing Denied Dec. 2, 1918. On the Merits, April 4, 1921. Rehearing Denied May 2, 1921.)

*(Syllabus by the Court.)*

1. **Appeal and error** ⊗⇒657(1)—Where certificates of clerk of trial court inconsistent as to completeness of transcript, case may be remanded.

Where, in the case of an appeal returnable to this court on July 18, the clerk of the trial court, on July 17, sends up an affidavit, as of that date to the effect that he has been assiduously at work on the transcript, but, for lack of time and by reason of other engagements of an official character, will be unable to complete the same by the return day, and the delay for the return of the appeal is thereupon extended to July 30, upon which day there is lodged in this court a transcript of appeal, certified by the clerk as complete, accurate, and correct, but as of date July 10, the court is confronted with two official certificates, from the same officer, which appear to conflict with each other; and, where, in such case, a motion to dismiss the appeal is filed on the ground that, in point of fact, and according to the admission of the clerk, the transcript was completed in time for the first return day, and the ex parte affidavits as to facts thus put at issue fail to clear the situation, the matter will be remanded to the trial court for the taking of testimony, with leave to the appellant, in the meanwhile, to produce a transcript which is not discreditable by a later certificate from the same officer than that which it bears.

O'Niell, J., dissenting.

*(Additional Syllabus by Editorial Staff.)*

On the Merits.

2. **Executors and administrators** ⊗⇒221(9)— Succession; note presented as claim against estate held spurious.

Where a note was presented as a claim against a decedent's succession, evidence *held* to support a finding that it was spurious.

Appeal from Twentieth Judicial District Court, Parish of Terrebonne; A. J. Caillouet, Judge ad hoc.

Claim by Nathan Tolchinsky against the Succession of Ernest Lirette. From a rejection of a claim and a dismissal of the suit, plaintiff appeals. On motion to dismiss. Case remanded, rehearing refused, and judgment subsequently affirmed on a hearing on the merits.

Butler & Wurzlow, of Houma, for appellant.

Harris Gagné, of Houma, and Beattie & Beattie, of Thibodaux, for appellee.

On Motion to Dismiss Appeal.

MONROE, C. J. [1] Plaintiff's demand having been rejected, and his suit dismissed, he was granted an appeal, suspensive and devolutive, returnable to this court on July 18, 1918, upon giving bond in an amount fixed by the trial judge, which he gave.

On July 17, his counsel filed in this court an application for an extension of the return day to July 30, which was accompanied by an affidavit of the clerk of the district court to the effect that he needed the additional time for the completion of the transcript, and, the extension having been granted, the transcript was filed on the return day thus fixed. On September 30 following, counsel for the appellees filed the motion now to be considered to dismiss the appeal, on the ground that the transcript was ready for delivery prior to July 18 and that the extension of time was obtained by reason of this court's having been misinformed as to the facts. There is attached to the motion an affidavit by appellees' junior counsel, from which it appears that he called upon the clerk of the district court, "not less than a week" before the first return day, was informed that the transcript was completed, and was shown, in the vault of the clerk's office, the triplicates thereof, bound and ready for filing. The affidavit further sets forth that the affiant called upon the clerk again on the return day (July 18), and, upon inquiry, was told by that officer that appellant's senior counsel had "a day or so before" stated that the notice of the completion of the transcript, with the enclosed bill, had been delayed in reaching him, and that he desired more time in which to communicate with his client, who lived in New Orleans, relative to taking the appeal; that he (the clerk) informed appellant's counsel "that he (the clerk) could conscientiously grant the desired extension because he desired to collate the said transcript, and that, accordingly, he then applied to the Supreme Court for an extension of the return day until July 30, 1918, and that only that morning * * * he had received from the Supreme Court the notice of the extension granted." The affidavit further sets forth that "affiant then and there notified the said clerk that he would make this affidavit before the Supreme Court and move for the dismissal of the appeal."

In connection with their motion and affidavit, counsel for appellees call the attention of the court to the fact that the certificate of the clerk, as contained in the transcript, to the effect that it is complete and accurate, bears date July 10, 1918.

Opposing the motion to dismiss, counsel for appellant submit a counter affidavit by the clerk, of which we make the following summary, to wit:

That the original return day was fixed at his instance because he then thought he could complete the transcript by that day; that he is a member of the "Local Board" of his parish, and that, its work having occupied most of his time, he intrusted the making of the transcript to his assistant; that the testimony taken on the trial had been typewritten, but "single spaced," indexed, and bound, when he discovered that it was not in accordance with the rules of the Supreme Court, regulating the preparation of transcripts, and had some correspondence with the clerk of that court on the subject, all of which occasioned delay; that he concluded that it would be better to rewrite the testimony; that, about a week before the (first) return day, the transcription of all the documents then in the record had been completed, the sheets placed between black covers, but unbound, and placed in the vault, and, in that condition, were shown to appellees' counsel; that affiant had not then inspected the transcript, but later discovered documents which had not been transcribed, and also discovered clerical errors, all of which would neces-

sitate the taking apart of the transcript, the correction of the errors, and the changing of the index; that affiant realized that it would have been dangerous to file the transcript in its then condition, and that a collation was necessary, in order to enable him to make his certificate; that a day or two before the return day Mr. Butler, of Butler & Wurzlow (counsel for appellant), called on affiant in order to ascertain whether the transcript would be ready, and expressed a desire to communicate with his client in New Orleans before taking it, and that affiant told him that he (affiant) could, conscientiously, ask for an extension, and explained the reasons; that, prior to July 18, he had informed Mr. Gagné (appellees' junior counsel) and also Mr. Butler, that he had discovered documents belonging to the suit which had not been transcribed, and that appellant's counsel had insisted that they be transcribed; that immediately after his conversation with appellant's counsel he prepared the affidavit for the extension of time, and also prepared the petition, all of which was done without the dictation of appellant's counsel; that it would have been absolutely impossible for him to have delivered the transcript in a completed state on July 18, and that his conversation with appellant's counsel did not alter the situation, which was that the transcript was not in such a condition that affiant could sign a certificate as to its accuracy, and if affiant had signed the certificate at that time he would have been guilty of certifying to something that was untrue; and the real reason for asking the extension was to gain time to put the transcript in shape for the proper certificate; that all the work of remodeling the transcript, changing the index, transcribing the documents previously written, and collating the transcript with the original documents was done after affiant had asked for the extension, and

that the work required several days; that appellant's counsel stated at the time that he called on affiant about the transcript; that he was ready to pay for same, if affiant was ready to deliver it.

Counsel for appellant complains that counsel for appellees should have filed an ex parte affidavit in this court in support of their motion to dismiss. There is no merit in the complaint. It is the usual method of bringing to the attention of the court questions affecting its appellate jurisdiction which are not disclosed by the record. Such affidavits are not acted upon without giving the other party in interest an opportunity to be heard, and, after such hearing, if this court deems it advisable, it may hear testimony or may refer the question presented back to the trial court in order to obtain it. Oertling v. Commonwealth Bonding & Casualty Co., 134 La. 26, 63 South. 611.

Counsel are also mistaken in the supposition that, though the appeal should be dismissed, it might be renewed, and hence, that the dismissal would be a vain thing. It is settled jurisprudence that where the appeal is perfected by the filing of the required bond, and the appellant fails to lodge the transcript in this court within the delay allowed for that purpose, the appeal is considered abandoned. Edenborn v. Kirkland, 136 La. 1021, 68 South. 111, and authorities there cited.

There are statements in the affidavit of the clerk which seem to be irreconcilable with each other, and not easily reconciled with those contained in the affidavit of appellee's counsel. He admits that he told the counsel on July 18 that the transcript had been completed, but elsewhere in the affidavit, he says that he told both Mr. Gagné and Mr. Butler, prior to July 18, that he had discovered documents that had not been transcribed, and he gives as one of the rea-

sons why the transcript was not completed, and could not have been completed, on July 18, that it was necessary to transcribe the discovered documents. He makes the following statements in his affidavit, to wit:

"That it would have been absolutely impossible for affiant to have delivered said transcript in a completed state on the 18th of July, and that any conversion he had with Mr. Butler did not alter the condition at all, which was that the transcript at that time was not in such condition that affiant could sign a certificate as to its accuracy, and, if affiant had signed the certificate at that time, he would have been guilty of certifying to something that was untrue; and the real reason for asking the extension was to gain time to put the transcript in shape for the proper certificate."

We have, therefore, two certificates from the clerk: The one, that the transcript was completed on July 10; the other, that it was incomplete on July 18, and that he required an extension of time to complete it; and we have his admission that he made a particular statement to Mr. Gagné on July 18, and his affidavit that the facts as they then existed though not within his knowledge did not authorize that statement; and, then, again, he appears to say in his affidavit that he had communicated these facts, or the more important one, to both Mr. Gagné and Mr. Butler at some time prior to July 18.

It might reasonably be supposed that the clerk improvidently certified the transcript on July 10, and, subsequently, after making alterations in it, improvidently neglected to certify the new creation; but, if that be true, then his official certificates would seem to lose something of their value and sanctity, and the appellant is threatened on the one hand with the dismissal of his appeal that, perhaps, should be maintained, and appellees are threatened on the other hand with the maintenance of an appeal that, perhaps, should be dismissed in either case upon the basis of an improvidently issued certificate. From any point of view (since the one certi-ficate is as much before this court as the other), we have no positive assurance that the transcript now in this court, certified as of date July 10, but discredited by the affidavit of the certifying officer, of date July 17, has ever been completed. We therefore conclude that, in order to afford an opportunity for the clearing up of the situation, and more particularly in view of the fact that we are not disposed to consume valuable time in dealing with the transcript in its present unfortunate condition, the case should be remanded, with leave to the litigants, respectively, to adduce such testimony in the usual manner, as may be relevant and admissible, concerning the facts here involved, and in order that the appellant may provide us with a transcript concerning the authentication of which there shall be somewhat less uncertainty.

It is accordingly ordered that this case be remanded to the district court, with instructions to that tribunal to receive such relevant testimony as may be offered on behalf of the appellant and appellees, respectively, upon the question whether the delay in the completion of the transcript of appeal herein was attributable to any fault of the clerk or to any fault of the appellant or his counsel, the testimony, when taken, under the supervision of the trial judge, to be returned to this court. It is further ordered that appellant have leave, in the meanwhile, to lodge in this court a transcript of appeal which is not discredited by a later certificate from the same officer than that which it bears, and to withdraw, if need be, the transcript (in triplicate) now on file.

O'NIELL, J., dissents, being of the opinion that the motion to dismiss the appeal should be overruled.

PROVOSTY, J., absent on account of illness, takes no part.

On the Merits.

PROVOSTY, J. This suit is upon a promissory note written upon a piece of paper 5¾x3 inches, yellowish, as if from age, more or less soiled, frayed and torn across, as if from much handling, smooth cut at the ends and along part of one side, and otherwise ragged at the edges, and said by the person who wrote the body of the note to have been torn from a pencil tablet. The writing is not lengthwise but crosswise the paper, and the lines run from margin to margin, thus:

New Orleans Oct. 1, 15.

Twenty months after date for value received I promise to pay to the order of Nathan Tolchinsky the sum of Twenty Seven Hundred Dollars at the Commercial Germania Trust & Savings Bank New Orleans with interest at the rate of eight per cent from date until paid.
Due June 1, 1917.
Ernest Lirette
Houma
La.
Box 301.

The decedent lived about half a mile out of the town of Houma. For some time prior to 1909 he was engaged in the business of buying and selling horses. He then engaged in selling milk in the town. In 1910 he gave up that occupation, and brought his cows to his plantation. What, at the time of his death, was the amount of his estate, what debts he owed, if any, whether his plantation was large or small; none of this is shown by the record. From the fact, however, that for the operating expenses of his plantation during the year 1915 only $2,200 was borrowed, and that this amount served not only for the plantation but also for the personal needs of himself and son (who was his partner in operating the plantation), we infer that his plantation was small, and that his financial resources cannot have been large. Since 1913, owing to bad health and approaching old age, he had retired from active participation in the management of the plantation. His exact age is not testified to, but from the fact that he had a granddaughter 19 years old and that he is spoken of by some of the witnesses as "the old man," and that one of the physicians who treated him in his illness says that he "must have been 72 or 73 years old," we assume that his age was about that. From the time he retired from active participation in the management of the plantation, as just stated, he was in the habit of going every morning after his breakfast to the town of Houma in his buggy, to get his newspaper and buy vegetables. Sometimes his infirmities would not allow of his doing this; and in the last years of his life he could not get into the buggy without assistance. He suffered, says one of the physicians, "from general nephritis, endocarditis and inflammation of the liver and spleen, cirrhosis of spleen and liver." He died April 21, 1917.

The body of the note is in the handwriting of the daughter of plaintiff, and the signature and the words below it are admitted to be in the handwriting of the decedent. The contention is that he wrote his name and address upon this piece of paper to serve as a memorandum, and that the note part was later superimposed.

Plaintiff was born in Kieff, Russia, and, as we gather, has never engaged in any other business than buying and selling horses and mules, except that at one time he bought a drug store, which soon was sold at sheriff sale. For some years he and a partner named Robinowitz have had a sales stable in New Orleans. He and his partner say that the partner contributed $3,000 to this business. How much plaintiff himself contributed the record does not show; but he has continued to travel through the country buying and selling horses, as was his wont in the past. He says that about 12 or 13 years ago the decedent was a heavy buyer of live

stock from him, as much as $1,200 and $1,-500 at a time, for which decedent always paid; and that 9 years ago the decedent borrowed $500, and the year following $400 from him; that he cannot say how many transactions he had with decedent, nor what was the largest; that he keeps no books; that he and decedent were friends, and decedent would sometimes spend a whole day with him when in town; that he and his wife lived above the stable; that it was there the note was executed; and in the manner testified to by his daughter, which is as follows:

"A. I visited my parents every morning, and while there Mr. Lirette came there. We were sitting there speaking, and Mr. Lirette said to my father, 'Nathan, I would like to borrow a couple of thousand dollars from you.' My father said, 'How much?' 'Well, about $2,500 or $3,000.' My father had been away and just gotten in that same day, and said, 'Well, I don't think I can spare you $3,000, but $2,500 or $2,700.' Mr. Lirette said, 'Well, I think I will make that do.' With that my father said to me, 'I think I would like to have a note,' and took out his memorandum book, and had no forms there, and took out a sheet, and I remember fully I trimmed it off straight and I made the note in presence of Mr. Lirette, with the interest at 8 per cent. Mr. Lirette then signed the note. It is customary—my father asked where he would be notified so the bank would know where to notify him, so Mr. Lirette filled out his postoffice address and box, and then my father counted out $2,700. We were sitting in the dining room."

She further testified that the money paid to Lirette consisted of bills which her father took out of his wallet.

Plaintiff testifies that he had the money with him at the moment, having just returned from a trip in the country selling horses and mules; that he always carries money with him, and had taken along with him on this trip some $1,200 or $1,500. He admits having gone into bankruptcy, but does not remember what his liabilities were, nor the date of the surrender. He first stated it to have been a couple of years, then six or seven years, ago. He surrendered no

mules, nor horses, nor money, nor notes, nor open accounts, but a piece of real estate worth $4,000, and "some old buggies and harness," etc. He obtained his discharge. At what date, is not stated.

It is possible that this note was executed as thus testified, but its peculiar appearance arouses suspicion; and that suspicion is strengthened by the improbabilities that the decedent would have wanted to borrow so large a sum; that if he had done so his family should not have known of it; that plaintiff should have had so large a sum in his wallet; that if he had it he should have been willing to lend it thus offhand without security to an old man of no better financial standing than the decedent, who, for borrowing $2,200 from a local bank, was required to execute a mortgage; that a horse trader should thus lightly lend $2,700 at 20 months' time; that a partner should lend what apparently was a considerable proportion of the working capital of his firm out of due course of business, and especially for so long a time, merely to accommodate his own friend; that a note should be written crosswise instead of lengthwise the paper; that a man in whose business promissory notes were being made so constantly as in plaintiff's should use a piece of pencil memorandum paper for making a note instead of a blank form, or, at any rate, such a piece of paper as is ordinarily used, especially for so important a sum, and when making the note at his own place of business.

A circumstance which may or may not be suspicious is that the maturity of the note should coincide so well with the proper time for presenting the note for payment after the death of Lirette.

Besides his own and his daughter's direct testimony to the note having been executed, plaintiff has his partner's, who says he remembers when Lirette came to their stable to inquire for plaintiff; and went upstairs to

see plaintiff, and on coming down did not deny having just executed the note which plaintiff then and there exhibited; and plaintiff has the testimony of a man named Berger, living in Houma, who says that he heard decedent shortly before his death make mention of the fact that he was indebted to plaintiff.

But plaintiff's partner, for the purpose, doubtless, of lending color to his testimony, went on to testify that the decedent called at plaintiff's place of business in New Orleans on the day preceding that on which the note was executed, and he and plaintiff and the latter's daughter testified that the decedent visited plaintiff at the same place of business four or five times after that at different dates; whereas the testimony of the daughter of decedent who lived in the same house with him, and that of his granddaughter, who lived across the street from him, is to the effect that it was well-nigh impossible that he could have absented himself to go to New Orleans without their knowing it, especially for one whole night, and the testimony of the physicians make it highly improbable that he could have ventured upon such a trip unattended. If the testimony of plaintiff's daughter and that of his partner be true, Lirette must have been in New Orleans at least two nights on the trip when he executed the note, for he says that Lirette called at plaintiff's place at 10 o'clock in the morning, and, not finding him in, called again at the same hour the next morning.

[2] The learned counsel for plaintiff argue that these defense witnesses may be mistaken; that their memory may be at fault; and that the old gentleman may have gone to New Orleans and they not know of it. And in an endeavor to bereave this testimony of its persuasiveness they have, in elaborate briefs, displaying rare powers of acute analysis on the part of their authors, dissected it minutely, and, it must be confessed, succeeded more or less in weakening the several parts. To the extent, indeed, that if the note itself did not come in such questionable shape, and so opportunely after the death of the maker, and the testimony of plaintiff's witnesses did not exhibit the flaws and improbabilities we have noted hereinabove, and others we have not deemed it necessary to advert to—for instance, the discrepancy between father and daughter as to the whereabouts of the note from the time of the date it bears to the time of its emergence after the death of the alleged maker—we should find ourselves in a condition of so much doubt that the fact of the genuineness of the signature would have had to be suffered to weigh down the scale; but upon the case as a whole we find ourselves firmly convinced, as the learned special judge who tried the case was, that the note is spurious.

The judgment appealed from is therefore affirmed at the cost of appellant.

SOMMERVILLE, J., takes no part, not having heard the argument.